

FILED

NOV 19 2021

AT 8:30_____ 3:50 ᴘM.
WILLIAM T. WALSH
CLERK

SPC.

SMS/RO/2021R00974

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Kevin McNulty |
| | : | |
| v. | : | Criminal No. 21-877-KM |
| | : | |
| THOMAS FARESE, and | : | 18 U.S.C. § 2 |
| DOMENIC J. GATTO, JR. | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1347 |
| | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1956(h) |
| | : | 18 U.S.C. § 1957(a) |

### I N D I C T M E N T

The Grand Jury for the District of New Jersey charges:

### COUNT ONE
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

1.     Unless otherwise indicated, at all times relevant to this Indictment:

### The Medicare Program

a.     Medicare was a federally-funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who receive benefits under Medicare were referred to as "Medicare beneficiaries."

b.     Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

c.    Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

d.    Medicare Part B covered non-institutional care that included physician services and supplies, such as durable medical equipment ("DME"), that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

e.    Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

f.    In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

g.    As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare was

2

conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

h.    Medicare-authorized suppliers of health care services, such as DMEPOS suppliers, could only submit claims to Medicare for reasonable and medically necessary services. Medicare would not reimburse claims for services that it knew were procured through kickbacks or bribes. Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and program instructions, as well as violating federal criminal law. For example, where a DME order was procured through the payment of a kickback in violation of the AKS, a claim to Medicare for reimbursement for that order was fraudulent. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for those elderly and other qualifying beneficiaries who had a genuine need for medical services.

**TRICARE**

i.    TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

3

j.     TRICARE was a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affected commerce.

**CHAMPVA**

k.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

l.     In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims had to have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them.

m.     CHAMPVA was a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affected commerce.

4

**Compounding**

n.    In general, "compounding" was a practice in which a licensed pharmacist, or a licensed physician, combined, mixed, or altered ingredients of a drug to create a medication tailored to the needs of an individual patient. Pharmacies engaged in the practice of compounding were referred to as "compounding pharmacies."

o.    Compounded drugs were not approved by the Food and Drug Administration ("FDA"); that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

p.    Generally, compounded drugs were prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient. For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or preservative, a compounded drug could be prepared excluding the substance that triggered the allergic reaction. Compounded drugs also could be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

## Relevant Individuals and Entities

q.     Defendant Thomas Farese ("Defendant FARESE") was a resident of Florida.

r.     Defendant Domenic J. Gatto, Jr. ("Defendant GATTO") was a resident of Florida. Defendant GATTO had a financial interest in a pharmacy benefits management company ("PBM-1") that conducted business with pharmacies across the United States. Defendant GATTO also owned, operated, and had a financial interest in a shell company located in Florida that he held out as a legitimate company (the "GATTO Shell Company").

s.     Brian Herbstman ("HERBSTMAN"), a co-conspirator not charged in this Indictment, was a resident of New Jersey. HERBSTMAN owned a company located in New Jersey that held the criminal proceeds from the schemes in which he, defendant GATTO, and Co-conspirator-1 engaged (the "Holding Company").

t.     Pat Truglia ("TRUGLIA"), a co-conspirator not charged in this Indictment, was a resident of Florida. TRUGLIA owned, operated, and had a financial interest in various entities located in Florida (the "TRUGLIA Supply Companies") through which TRUGLIA obtained doctors' orders for DME (hereinafter referred to as "DME Orders").

u.     Nicholas Defonte ("DEFONTE") and Christopher Cirri ("CIRRI"), co-conspirators not charged in this Indictment, were each residents of New Jersey. DEFONTE and CIRRI controlled and had financial interests in various entities located in New Jersey (the "CIRRI/DEFONTE Supply

Companies") through which they obtained DME Orders as well as prescriptions for compounded medications ("Compound Orders").

v.     Christian Mohases ("MOHASES"), a co-conspirator not charged in this Indictment, was a resident of Santa Ana, California. MOHASES and other individuals owned and operated multiple call centers (the "MOHASES Supply Companies") through which MOHASES and others obtained DME Orders.

w.     Co-conspirator-1 ("CC-1") was a resident of Mississippi. CC-1 had financial interests in numerous compounding pharmacies (collectively, the "CC-1 Pharmacies"). As described below the CC-1 Pharmacies received Compound Orders from individuals and entities—including CIRRI and DEFONTE (through the CIRRI/DEFONTE Supply Companies)—who expected and received kickbacks in return for every Compound Order that resulted in reimbursement from Medicare and other health care benefit programs.

x.     Aaron Williamsky ("WILLIAMSKY") and Nadia Levit ("LEVIT"), co-conspirators not charged in this Indictment, were each residents of New Jersey who owned, operated, and had financial and controlling interests in numerous DME supply companies located in New Jersey and elsewhere (collectively, the "Subject DME Companies"). The Subject DME Companies primarily supplied DME such as knee, ankle, back, wrist, and shoulder braces to beneficiaries of both federally-funded and privately-funded health care benefit programs. DME Orders were provided to the Subject DME Companies by individuals and entities (collectively, the "DME Suppliers")— including TRUGLIA,

CIRRI, DEFONTE, and MOHASES—who expected and received kickbacks in return for each DME Order that resulted in reimbursement from Medicare, TRICARE, CHAMPVA, and other health care benefit programs.

y.    DME Company-1, one of the Subject DME Companies, was a DME supply company located in Florida. Defendant FARESE—together with WILLIAMSKY, LEVIT, and TRUGLIA—owned DME Company-1. DME Company-1 was a registered DMEPOS supplier with Medicare. Defendant FARESE and his co-conspirators concealed their affiliation with DME Company-1 by failing to disclose themselves as owners to Medicare.

z.    DME Company-2 and DME Company-3, two of the Subject DME Companies, were DME supply companies located in New Jersey and Florida, respectively. Defendant GATTO—together with WILLIAMSKY, LEVIT, HERBSTMAN, and CC-1—owned DME Company-2 and DME Company-3. DME Company-2 and DME Company-3 were registered DMEPOS suppliers with Medicare. Similar to DME Company 1, defendant GATTO and his co-conspirators concealed their affiliation with DME Companies-2 and -3 by failing to disclose themselves as owners to Medicare.

**The Conspiracy**

2.    From in or around March 2018 through in or around April 2019, in the District of New Jersey, and elsewhere, defendants

**THOMAS FARESE and
DOMENIC J. GATTO, JR.**

did knowingly and intentionally conspire and agree with others to knowingly and willfully commit certain offenses, that is:

a.    to execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money or property owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347; and

b.    to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

**Goal of the Conspiracy**

3.    The goal of the conspiracy was for the defendants and their co-conspirators to unlawfully enrich themselves and others known and unknown by causing the submission of false and fraudulent claims to health care benefit programs.

**Manner and Means of the Conspiracy**

4.    It was part of the conspiracy that:

The DME Companies

a.    Starting as early as in or around February 2015, WILLIAMSKY and LEVIT began purchasing and establishing the Subject DME Companies in New Jersey and elsewhere. Each of the Subject DME Companies was enrolled with Medicare to be reimbursed for legitimate DME claims. As described above, each of the Subject DME Companies certified that any claim thereafter submitted to Medicare for reimbursement complied with the relevant laws, regulations, and program instructions.

b.    Starting in or around March 2018, defendants FARESE and GATTO began purchasing ownership stakes in several of the Subject DME Companies. To conceal their involvement in the scheme, defendants FARESE and GATTO failed to disclose their ownership interests to Medicare, and instead relied on third-party nominee owners.

Kickback Payments in Exchange for DME Orders

c.    To ensure that their DME companies would receive a steady flow of reimbursement money from Medicare and other health care programs,

10

defendant FARESE, defendant GATTO, WILLIAMSKY, LEVIT, and others conspired to enter into kickback agreements with DME Suppliers who could regularly supply them with DME Orders, including TRUGLIA, DEFONTE, CIRRI, and MOHASES. The process involved multiple layers of kickbacks, intermediaries, and unlawful conduct, as set forth below.

      d.    First, to generate DME Orders, DME Suppliers like TRUGLIA, DEFONTE, CIRRI, and MOHASES identified qualified beneficiaries located in New Jersey and elsewhere through the use of marketing call centers under their direction. Once the marketers identified beneficiaries, the DME Suppliers paid telemedicine companies to obtain corresponding orders for DME, regardless of whether that DME was medically necessary for the beneficiary.  Specifically, DME Suppliers (including CIRRI, DEFONTE, TRUGLIA, and MOHASES) agreed to pay the telemedicine companies for each DME Order that the telemedicine companies provided for those beneficiaries. For example, the CIRRI/DEFONTE Supply Companies paid two telemedicine companies in excess of approximately $3.3 million for DME Orders.

      e.    After obtaining the DME Orders through these illicit methods, the DME Suppliers transmitted the completed DME Orders to the Subject DME Companies for processing. The Subject DME Companies paid the DME Suppliers kickbacks ranging from approximately $160 to $385 in exchange for each DME

Order. The Subject DME Companies then arranged for the prescribed DME, such as orthotic braces, to be shipped to the individual beneficiaries.

      f.     Finally, the Subject DME Companies submitted or caused to be submitted DME reimbursement claims to Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs.

Defendant GATTO Brokered Additional Kickbacks

      g.     In or around March 2018, defendant GATTO, HERBSTMAN, and CC-1 introduced CIRRI and DEFONTE to WILLIAMSKY as potential DME Suppliers for the Subject DME Companies. At a meeting in New Jersey in or around March 2018 with WILLIAMSKY and HERBSTMAN, CIRRI and DEFONTE agreed to provide DME Orders to the Subject DME Companies in return for approximately $265 in kickbacks for each DME Order procured.

      h.     For brokering the kickback arrangement, GATTO, HERBSTMAN, and CC-1 received set payments for each DME Order that CIRRI and DEFONTE provided to the Subject DME Companies.

      i.     The Subject DME Companies subsequently submitted claims for reimbursement to Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs for the fraudulently obtained DME Orders.

      j.     From in or around March 2018 through in or around April 2019, the Subject DME Companies billed Medicare, TRICARE, and CHAMPVA approximately $28.3 million, and Medicare, TRICARE, and CHAMPVA paid the Subject DME Companies approximately $17 million in reimbursements for the

DME Orders that were procured by CIRRI and DEFONTE in exchange for kickbacks.

<u>Defendant GATTO Expands the Scheme Through Other DME Companies</u>

k.    In or around May 2018, defendant GATTO provided WILLIAMSKY with approximately $290,000 in cash in exchange for an ownership interest in DME Company-3. To conceal their interests in DME Company-3, defendant GATTO, WILLIAMSKY, and LEVIT did not disclose their ownership interest in DME Company-3 to Medicare. Instead, as with other aspects of the scheme, the purported owner disclosed to Medicare was Nominee Owner-3. In exchange for serving as the nominee owner, defendant GATTO and his co-conspirators paid Nominee Owner-3 approximately $10,000 a month.

l.    In order to further conceal his interest in DME-3, defendant GATTO did not directly transfer his investment money to DME Company-3, but instead funneled the payment through the GATTO Shell Company and the Holding Company.

m.    Defendant GATTO also had an interest with WILLIAMSKY, LEVIT, HERBSTMAN, and CC-1 in DME Company-2 (collectively with DME Company-3, "the GATTO DME Companies"), and again concealed his involvement by failing to disclose his ownership interest to Medicare and

receiving payments through the GATTO Shell Company and the Holding Company.

n.    Like the other Subject DME Companies, the GATTO DME Companies received DME Orders from DME Suppliers, including TRUGLIA, MOHASES, CIRRI, DEFONTE, and others through kickback arrangements.

o.    From in or around May 2018 through in or around April 2019, defendant GATTO and his co-conspirators used the GATTO DME Companies to submit or cause to be submitted fraudulent claims for reimbursement, including the following:

i.    On or about March 19, 2019, DME Company-2 electronically submitted approximately three claims to Medicare for reimbursement of approximately six braces for Beneficiary-1, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by the CIRRI/DEFONTE Supply Companies in exchange for kickbacks. Medicare subsequently paid DME Company-2 approximately $2,520.87 in reimbursement for the fraudulent claims.

ii.    On or about March 18, 2019, DME Company-3 electronically submitted approximately three claims to Medicare for reimbursement of approximately seven braces for Beneficiary-2, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by the MOHASES Supply Companies in exchange for kickbacks. Medicare subsequently paid DME Company-3 approximately $2,841.22 in

reimbursement for the fraudulent claims, but Beneficiary-2 did not receive the braces.

iii.    On or about March 28, 2019, DME Company-3 electronically submitted approximately two claims to Medicare for reimbursement of approximately six braces for Beneficiary-3, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by the MOHASES Supply Companies in exchange for kickbacks. Medicare subsequently paid DME Company-3 approximately $1,879.98 in reimbursement for the fraudulent claims.

### Defendant FARESE Purchases Interest in DME Company-1

p.    In or around May 2018, defendant FARESE, WILLIAMSKY, and TRUGLIA agreed that defendant FARESE and TRUGLIA would purchase an ownership interest in DME Company-1, one of the Subject DME Companies. Thereafter, in or around June 2018, defendant FARESE invested approximately $500,000 into DME Company-1.

q.    As with other aspects of the scheme, to evade detection, defendant FARESE, TRUGLIA, WILLIAMSKY, and LEVIT failed to disclose their ownership interests in DME Company-1 to Medicare. The purported owner disclosed to Medicare was a nominee owner. In exchange for serving as the nominee owner, the co-conspirators paid Nominee Owner-1 approximately $10,000 a month.

r. Like the other Subject DME Companies, DME Company-1 received DME Orders from DME Suppliers, including TRUGLIA and MOHASES, in exchange for kickbacks.

s. From in or around June 2018 through in or around April 2019, defendant FARESE and his co-conspirators used DME Company-1 to submit or cause to be submitted fraudulent claims for reimbursement, including the following:

i. On or about July 19, 2018, DME Company-1 electronically submitted approximately four claims to Medicare for reimbursement of approximately eight braces for Beneficiary-4, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by the MOHASES Supply Companies in exchange for kickbacks. Medicare subsequently paid DME Company-1 approximately $3,325.53 in reimbursement for the fraudulent claims.

ii. On or about July 20, 2018, DME Company-1 electronically submitted approximately four claims to Medicare for reimbursement of approximately eight braces for Beneficiary-5, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by the MOHASES Supply Companies in exchange for kickbacks. Medicare subsequently paid DME Company-1 approximately $3,182.05 in reimbursement for the fraudulent claims.

iii. On or about February 1, 2019, DME Company-1 electronically submitted approximately three claims to Medicare for

reimbursement of approximately six braces for Beneficiary-6, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by TRUGLIA in exchange for kickbacks. Medicare subsequently paid DME Company-1 approximately $2,027.38 in reimbursement for the fraudulent claims.

t.     In this manner, defendants FARESE and GATTO submitted and caused the submission of claims to Medicare, TRICARE, CHAMPVA, and other health care benefit programs for DME Orders that were (i) medically unnecessary; (ii) obtained through the payments of kickbacks and bribes and therefore not eligible for federal reimbursement; and/or (iii) not provided as represented.

<u>Profits from the Scheme</u>

u.     As a result of the scheme, from in or around June 2018 through in or around April 2019, Medicare, TRICARE, and CHAMPVA paid DME Company-1 approximately $2,869,751 in reimbursements for fraudulent DME Orders. From between in or around August 2018 and April 2019, defendant FARESE and TRUGLIA received approximately $730,000 in profits from the scheme for DME Orders passed through DME Company-1.

v.     As a further result of the scheme, Medicare, TRICARE, and CHAMPVA paid the GATTO DME Companies at least approximately $5,390,458 in reimbursements for fraudulent DME Orders, a portion of which was distributed to defendant GATTO. For example, from between in or around May 2018 and April 2019, the GATTO DME Companies funneled approximately

$864,432 in profits from the scheme to the Holding Company and the GATTO

Shell Company, for the benefit of defendant GATTO and his co-conspirators.

In violation of Title 18, United States Code, Section 1349.

**COUNTS TWO THROUGH SEVEN**
**(Health Care Fraud)**

1.    The allegations in Paragraphs 1, 3, and 4 of Count 1 of this Indictment are realleged here.

2.    On or about the following dates, in the District of New Jersey, and elsewhere, defendants

**THOMAS FARESE and**
**DOMENIC J. GATTO, JR.**

did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program, namely, Medicare, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services:

| Count | Approximate Date of Fraudulent Claim | Defendant |
|-------|--------------------------------------|-----------|
| 2 | 07/19/2018 | FARESE |
| 3 | 07/20/2018 | FARESE |
| 4 | 02/01/2019 | FARESE |
| 5 | 03/19/2019 | GATTO |
| 6 | 03/18/2019 | GATTO |
| 7 | 03/28/2019 | GATTO |

In violation of Title 18, United States Code, Section 1347 and Section 2.

## COUNT EIGHT
### (Conspiracy to Violate the Federal Anti-Kickback Statute)

1.      The allegations in Paragraphs 1, 3, and 4 of Count 1 of this Indictment are realleged here.

2.      From in or around March 2018 through in or around April 2019, in the District of New Jersey, and elsewhere, defendants

### THOMAS FARESE and
### DOMENIC J. GATTO, JR.

did knowingly and intentionally conspire and agree with others to commit certain offenses against the United States, that is:

a.      to knowingly and willfully offer and pay remuneration, including any kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

b.      to knowingly and willfully solicit and receive remuneration, including any kickback, bribe, or rebate, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

**Goal of the Conspiracy**

3.      The goal of the conspiracy was for the defendants and others to unlawfully enrich themselves by agreeing to offer, pay, solicit, and receive kickbacks and bribes in exchange for DME Orders that were (i) medically unnecessary; (ii) obtained through the payments of kickbacks and bribes and therefore not eligible for federal reimbursement; and/or (iii) not provided as represented, which they thereafter submitted or caused to be submitted to Medicare, TRICARE, CHAMPVA, and other federal and private health care programs.

**Manner and Means of the Conspiracy**

4.      It was part of the conspiracy that:

a.      The defendants and their co-conspirators agreed to enter into kickback agreements with DME Suppliers who could regularly supply their DME Companies with DME Orders, including TRUGLIA, DEFONTE, CIRRI, and MOHASES.

b.      In exchange for brokering the kickback scheme between CIRRI and DEFONTE (through the CIRRI/DEFONTE Supply Companies) and WILLIAMSKY and LEVIT (through the Subject DME Companies), CIRRI and DEFONTE agreed to pay defendant GATTO, HERBSTMAN, and CC-1 a kickback

of approximately $30 (and later, $10) for each DME Order that CIRRI and DEFONTE provided to the Subject DME Companies.

      c.     The DME Suppliers procured DME Orders for the scheme in return for kickback payments from the Subject DME Companies (including DME Company-1, DME Company-2, and DME Company-3).

      d.     For example, as a result of the arrangement brokered by defendant GATTO, HERBSTMAN, and CC-1, the CIRRI/DEFONTE Supply Companies provided DME Orders to the Subject DME Companies in exchange for kickback payments, which were subsequently billed to Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs for reimbursement.

      e.     Defendants FARESE and GATTO (through the Subject DME Companies, including DME Company-1, DME Company-2, and DME Company-3) paid kickbacks to the DME Suppliers in exchange for DME Orders, and then subsequently billed and caused to be billed the DME Orders to Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs.

## Overt Acts

     5.     In furtherance of the conspiracy, and to effect its goal, defendants FARESE, GATTO, and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

      a.     On or about May 22, 2018, defendant GATTO, HERBSTMAN, and CC-1 received a kickback payment (through the Holding Company) from

22

one of the CIRRI/DEFONTE Supply Companies of $8,190 based on CIRRI and DEFONTE providing approximately 819 DME Orders to the Subject DME Companies.

    b.    On or about August 7, 2018, a co-conspirator cause DME Company-1 to wire a kickback payment of approximately $50,000 to one of the MOHASES Supply Companies.

    c.    On or about June 20, 2018, a co-conspirator caused DME Company-3 to wire a kickback payment of approximately $100,000 to one of the MOHASES Supply Companies.

    d.    On or about December 4, 2018, a co-conspirator caused DME Company-2 to wire a kickback payment of approximately $50,000 to one of the MOHASES Supply Companies.

    e.    On or about March 19, 2019, a co-conspirator caused DME Company-2 to wire a kickback payment of approximately $60,800 to one of the CIRRI/DEFONTE Supply Companies.

    In violation of Title 18, United States Code, Section 371.

## <u>COUNT NINE</u>
### (Conspiracy to Violate the Federal Anti-Kickback Statute)

1.    The allegations in Paragraphs 1,  3, and 4 of Count 1, and Paragraphs 3 to 5 of Count 8 of this Indictment, are realleged here.

2.    From in or around January 2018 through in or around April 2019, in the District of New Jersey, and elsewhere, defendant

### DOMENIC J. GATTO, JR.

did knowingly and intentionally conspire and agree with others to commit certain offenses against the United States, that is:

a.    to knowingly and willfully offer and pay remuneration, including any kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

b.    to knowingly and willfully solicit and receive remuneration, including any kickback, bribe, or rebate, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

24

**Goal of the Conspiracy**

3.     The goal of the conspiracy was for the defendant and others to unlawfully enrich themselves by soliciting, receiving, offering, and paying kickbacks and bribes in exchange for Compound Orders they thereafter submitted or caused to be submitted to Medicare and other health care programs.

**Manner and Means of the Conspiracy**

4.     It was part of the conspiracy that:

a.     On or about January 24, 2018, defendant GATTO, HERBSTMAN, WILLIAMSKY, CC-1, and others met to discuss a scheme whereby WILLIAMSKY would arrange for DME Suppliers to provide Compound Orders to the CC-1 Pharmacies in exchange for kickbacks of a portion of the reimbursement from Medicare and other health care programs. Pursuant to the scheme, WILLIAMSKY would direct the DME Suppliers to pitch compounded prescriptions along with DME to Medicare beneficiaries. If the pitches resulted in Compound Orders, those Compound Orders would be provided to the CC-1 Pharmacies, which would bill Medicare and other health care programs. In return for arranging for the DME Suppliers to generate Compound Orders, WILLIAMSKY would receive a kickback for each reimbursed prescription. In exchange for arranging for the kickback scheme, defendant GATTO agreed to receive a kickback from the CC-1 Pharmacies for each Compound Order provided

by the DME Suppliers that was subsequently reimbursed by a federal or private health care benefit program.

b.    On or about same day, HERBSTMAN sent a text message on behalf of defendant GATTO to WILLIAMSKY explaining the kickbacks WILLIAMSKY would receive for directing the DME Suppliers to generate the Compound Orders: "Net on scripts is about 300-400.00. To you. In your pocket [o]n avg. that's from dom [GATTO]".

c.    Defendant GATTO sought to make sure the nature of the kickback payments was concealed. For example, on or about February 6, 2018, HERBSTMAN sent a text message to WILLIAMSKY explaining that "we have to make sure we agree to a certain number for income and say I am a independent consultant in charge of 'new business development.' I'm sure you are aware of this stuff due to government compliance. Dom [GATTO] told me to make sure everyone on same page so no issues"

d.    On or about March 13, 2018, defendant GATTO, HERBSTMAN, WILLIAMSKY, CC-1, and others had a meeting in Florida to further plan the compounding scheme.

e.    On or about March 26, 2018, an individual associated with CC-1 (hereinafter, "Individual-1") sent an email to defendant GATTO, HERBSTMAN, WILLIAMSKY, LEVIT, and others with the prescription pad for

compounded drugs to be used by the DME Suppliers to generate Compound Orders.

f.    On or about April 17, 2018, defendant GATTO, HERBSTMAN, CIRRI, CC-1, and Individual-1 met in New Jersey to discuss the DME scheme and the compounding scheme.

g.    On or about April 19, 2018, defendant GATTO, WILLIAMSKY, LEVIT, CC-1, and others received an email from Individual-1 providing the compounded drug prescription pads and details for providing Compound Orders to the CC-1 Pharmacies. The email explained that prescriptions and initial refills would be mailed by one of the CC-1 Pharmacies to the beneficiaries without confirming that the beneficiaries wanted the compounded medications.

h.    On or about May 6, 2018, defendant GATTO received a text message from WILLIAMSKY noting that WILLIAMSKY was having difficulty reaching CC-1. Defendant GATTO responded via text message, "He's bad w the phone so its easy to keep him out of the day to day biz. The pharmacy works and pays. That's what he's there for...I can handle the rest for evwry1."

i.    On or about May 25, 2018, defendant GATTO received an email from WILLIAMKSY containing a forwarded email from one of the DME Suppliers. In the email, the DME Supplier explained that the DME Supplier had provided numerous Compound Orders to one of the CC-1 Pharmacies ("Pharmacy-1") but had yet to receive any kickback payments: "It has cost us roughly $2,000 to put these orders in to [Pharmacy-1] so far. Not a huge

investment, but a concerning one, when there has been zero return or hope of any return."

j.    On or about May 31, 2018, defendant GATTO responded to WILLIAMSKY regarding the DME Supplier's complaint that it had not yet received its kickbacks in exchange for the Compound Orders: "We/[Pharmacy-1] has been speaking w [the DME Supplier] and has been trying to educate them and it's going but going slow. There are 2 others that are also trying to send over claims but again these [DME Suppliers] need to require more detail from the Doc and make sure the Doc is aware of the insurances carriers as [Insurer-1] and [Insurer-2] are the 2 big issues in our biz right now and not paying. If you would like to discuss let me know or we will just work thru [DME Suppliers]."

k.    During the course of the scheme, DME Suppliers, including the CIRRI/DEFONTE Supply Companies, provided Compound Orders to the CC-1 Pharmacies, which were subsequently billed to Medicare and other health care benefit programs for reimbursement. Defendant GATTO, CIRRI, DEFONTE, and others thereafter received kickbacks from the CC-1 Pharmacies, funneled through companies that CC-1 controlled. For example, from in or around March 2018 through in or around May 2019, one of the CC-1 Pharmacies transferred approximately $3,264,062.24 in kickbacks to entities associated with CC-1.

**Overt Acts**

5.    In furtherance of the conspiracy, and to effect its goal, defendant GATTO and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

a.    On or about April 17, 2018, defendant GATTO and others met in New Jersey to discuss the compounding scheme.

b.    On or about May 25, 2018, WILLIAMSKY received an email from one of the DME Suppliers regarding the compounding scheme.

c.    On or about May 25, 2018, WILLIAMSKY forwarded defendant GATTO the above-referenced email of the same date from the DME Supplier.

d.    On or about May 31, 2018, defendant GATTO sent an email to WILLIAMSKY discussing ongoing issues related to implementing the compounding scheme.

In violation of Title 18, United States Code, Section 371.

## COUNT TEN
### (Conspiracy to Transact in Criminal Proceeds)

1.     The allegations in Paragraphs 1, 3, and 4 of Count 1 of this Indictment, and Paragraphs 3 to 5 of Count 8 of this Indictment are realleged here.

2.     From in or around April 2018 through in or around May 2019, in the District of New Jersey, and elsewhere, defendant

**DOMENIC J. GATTO, JR.**

did knowingly and intentionally conspire and agree with others to knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is: health care fraud, contrary to Title 18, United States Code, Section 1347; wire fraud, contrary to Title 18, United States Code, Section 1343; the payment and receipt of kickbacks, contrary to Title 42, United States Code, Sections 1320a-7b(1)(A) and (2)(A); and conspiracy to pay and receive health care kickbacks, contrary to Title 18, United States Code, Section 371, contrary to Title 18, United States Code, Section 1957.

**Goal of the Conspiracy**

3.     The goal of the conspiracy was for defendant GATTO and others to distribute and profit from the illegal proceeds of the health care fraud, wire fraud, and kickback schemes described herein.

**Manner and Means of the Conspiracy**

4.     It was part of the conspiracy that:

a.     Defendant GATTO, HERBSTMAN, and others conspired and agreed that HERBSTMAN would transfer some or all of the proceeds of the fraud and kickback scheme described in Counts 1 to 8 of this Indictment to defendant GATTO by transferring the criminal proceeds from the GATTO DME Companies into the Holding Company, and then into the GATTO Shell Company.

b.     On or about April 23, 2018, defendant GATTO and CC-1 received an email from HERBSTMAN explaining that HERBSTMAN was setting up the Holding Company in New Jersey, along with a bank account, for the purpose of holding the proceeds of the scheme.

c.     From in or around July 2018 through in or around May 2019, HERBSTMAN (through the Holding Company) transferred approximately $477,500 in proceeds (the "Criminal Proceeds") from the health care fraud, wire fraud, and kickback schemes into the GATTO Shell Company. Defendant GATTO thereafter transferred portions of the Criminal Proceeds out of the GATTO Shell

Company into a bank account under his control (the "GATTO Account") and also engaged in other financial transactions.

d.    For example, on or about December 19, 2018, a co-conspirator caused approximately $25,000 in Criminal Proceeds to be transferred from DME Company-3 to the Holding Company. On or about the same day, a co-conspirator caused approximately $15,000 in Criminal Proceeds to be transferred from the Holding Company in New Jersey to the GATTO Shell Company in Florida. Thereafter, on or about December 20, 2018, defendant GATTO transferred or caused to be transferred approximately $15,000 from the GATTO Shell Company into the GATTO Account.

e.    Similarly, on or about April 20, 2019, HERBSTMAN wrote a check for approximately $50,000 in Criminal Proceeds from DME Company-2 to the Holding Company with the memo line "distribution." On or about April 21, 2019, HERBSTMAN wrote a check for approximately $25,000 from the Holding Company to the GATTO Shell Company with the memo line "distribution." HERBSTMAN traveled to Florida and provided the check to defendant GATTO. On or about April 25, 2019, defendant GATTO deposited or caused to be deposited the $25,000 check from the Holding Company into a bank account for the GATTO Shell Company.

f.    On or about April 28, 2019, HERBSTMAN wrote another check for approximately $10,000 from the Holding Company to the GATTO Shell Company with the memo line "distribution." On or about May 3, 2019, defendant

GATTO deposited or caused to be deposited the $10,000 check from the Holding

Company into the account for the GATTO Shell Company.

  In violation of Title 18, United States Code, Section 1956(h).

## COUNT ELEVEN
### (Transacting in Criminal Proceeds)

1.    The allegations in Paragraphs 1, 3, and 4 of Count 1 of this Indictment, Paragraphs 3 to 5 of Count 8 of this Indictment, Paragraphs 3 to 5 of Count 9 of this Indictment, and Paragraph 4 of Count 10 of this Indictment are realleged here.

2.    On or about April 25, 2019, in the District of New Jersey, and elsewhere, defendant

### DOMENIC J. GATTO, JR.

did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, specifically, the deposit of a check in the amount of $25,000, such property having been derived from a specified unlawful activity, that is: health care fraud, contrary to Title 18, United States Code, Section 1347; wire fraud, contrary to Title 18, United States Code, Section 1343; the payment and receipt of kickbacks, contrary to Title 42, United States Code, Sections 1320a-7b(1)(A) and (2)(A); and conspiracy to pay and receive health care kickbacks, contrary to Title 18, United States Code, Section 371.

In violation of Title 18, United States Code, Section 1957(a) and Section 2.

**FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH NINE**

1.      Upon conviction of one or more of the Federal health care offenses, as defined in 18 U.S.C. § 24, alleged in Counts 1 through 9 of this Indictment, the defendants charged in each respective count shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, obtained by the defendants charged in each respective count that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses charged in Counts One through Nine of this Indictment.

**FORFEITURE ALLEGATION AS TO COUNTS TEN AND ELEVEN**

2.      Upon conviction of the money laundering offenses alleged in Counts 10 and 11 of this Indictment, defendant

**DOMENIC J. GATTO, JR.**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all property, real and personal, involved in the charged money laundering offenses, and all property traceable to such property.

**SUBSTITUTE ASSETS PROVISION**
**(Applicable to All Forfeiture Allegations)**

3.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).



RACHAEL A. HONIG
Acting United States Attorney

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
United States Department of Justice

36

CASE NUMBER: 21 cr-877-KM

# United States District Court
## District of New Jersey

**UNITED STATES OF AMERICA**

v.

**THOMAS FARESE and
DOMENIC J. GATTO, JR.**

## INDICTMENT FOR

**18 U.S.C. §§ 371, 1347, 1349,
1956(h), 1957(a) and 2**

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

SEAN M. SHERMAN, RYAN O'NEILL
ASSISTANT U.S. ATTORNEYS
973-645-2733

DARREN C. HALVERSON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION